[Cite as *State v. Henderson*, 2018-Ohio-3797.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106627

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTONIO HENDERSON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-613454-A

**BEFORE:** Boyle, J., McCormack, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 20, 2018

[Cite as *State v. Henderson*, 2018-Ohio-3797.]

**ATTORNEY FOR APPELLANT**

Richard E. Hackerd
55 Public Square, Suite 2100
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Sarah Denney
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Antonio Henderson, appeals his convictions. He raises three assignments of error for our review:

> 1. The trial court prejudicially excluded testimony designed to develop the defense theory that another person was the shooter when it excluded testimony about the relationship between Brittany Jackson and her girlfriend as a possible motive of a different shooter.

> 2. Defendant was wrongfully convicted of felonious assault in Count One.

> 3. Defendant's counsel was ineffective and thereby denied Henderson a fair trial.

{¶2} Finding no merit to his arguments, we affirm his convictions.

## I. Procedural History and Factual Background

{¶3} In February 2017, Henderson was indicted on six counts: two counts of felonious assault in violation of R.C. 2903.11(A)(2), both second-degree felonies, with one- and three-year firearm specifications; one count of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162, a third-degree felony, with one- and three-year firearm specifications; one count of domestic violence in violation of R.C. 2929.25(A), a first-degree misdemeanor; one count of criminal damaging or endangering in violation of R.C. 2909.06(A)(1), a first-degree misdemeanor, with a furthermore clause that the violation "created a risk of harm to any person"; and intimidation of a crime victim or witness in violation of R.C. 2921.04(B)(2), a third-degree felony, with one- and three-year firearm specifications. Henderson pleaded not guilty to all charges and waived his right to a jury trial. The following facts were presented to the bench.

**{¶4}** Brittany Jackson, the victim, testified that Henderson is her brother. On December 24, 2016, Brittany went to visit her sister around 8:00 p.m. Brittany drove her girlfriend's car to her sister's house and took her nephew, K.B., with her. Brittany believed K.B. to be Henderson's four-year-old son. Henderson, however, did not believe that he was K.B.'s father.

**{¶5}** When Brittany got to her sister's house, Henderson was also there, sleeping on the couch. Brittany said that she and Henderson were not on "speaking terms" at that time. When Henderson woke up, Brittany told K.B. to "go talk to his dad." Henderson got angry at Brittany because she brought K.B. to the house. Henderson and Brittany got into a "heated argument" over K.B. The argument lasted for about ten minutes inside and then continued outside of the house. Brittany's parents, who lived two houses down from Brittany's sister, came from their house and calmed Brittany down.

**{¶6}** Brittany explained that after she calmed down, Henderson walked to his car, which was parked in front of her sister's house. Brittany said that when he got to his car, he reached down to get what she believed to be a gun. She did not see a gun, but she heard what sounded like him putting bullets into a gun.

**{¶7}** Brittany walked with her parents to their house. Her mother tried to keep Brittany inside her house, but Brittany was "frustrated at this point," so she was still "yelling" and "screaming." Brittany went back outside and was standing in her parents' front yard when Henderson "raised the gun up" at her "like he was going to shoot." Brittany asked Henderson if he was going to shoot her. Brittany thought Henderson was

serious so she ran. By the time she "hit the third step towards [her] mom's house," she heard shots being fired. Her mother and stepfather were on their porch.

{¶8} Brittany explained that there was an abandoned house between her parents' house and her sister's house. When Henderson began shooting at her, he was on the sidewalk between her sister's house and the abandoned house. Brittany's girlfriend's car, which Brittany had been driving, was parked in her parents' driveway and was between her and Henderson. Brittany testified that six shots hit her girlfriend's car.

{¶9} Brittany testified that when Henderson fired the shots, she ran into her parents' house and called 911. The 911 call was played in court.[1] She testified that she told the 911 operator that her brother shot at her five to six times. She also said that she told the 911 operator that she had a license to carry and conceal a weapon ("CCW") and that she "put her weapon up." She explained that she did not have her gun with her and that it was in a safe at her house in Warrensville Heights. When she said that she "put her weapon up" to the 911 operator, she explained that she meant her pepper spray.

{¶10} On cross-examination, Brittany stated that she realized that Henderson was shooting at her car and not her because all of the bullets hit her girlfriend's car. She opined that if he had meant to shoot at her, he could have shot at the house when she ran. But she further explained on redirect examination that Henderson "was shooting in [her] direction."

---

[1]The 911 call is not in the record on appeal. Neither the state nor Henderson requested that it be admitted into evidence.

**{¶11}** Police officers who arrived on the scene found ten spent shell casings and one spent .45-caliber round on the tree lawn, sidewalk, and street in front of Brittany's sister's house. Police towed Brittany's girlfriend's vehicle for processing. They found six exterior bullet holes caused by bullets entering the vehicle's right side (the side facing Henderson), one exit hole on the right side, and several bullet holes on the interior of the vehicle where bullets passed "into the trunk." They also found one bullet inside the trunk. There were no bullet holes with rust, which would indicate that the vehicle had older bullet holes.

**{¶12}** Detective Michael Kitchen testified that he interviewed Brittany and her stepfather the day after the incident. Brittany's mother would not talk to him. Detective Kitchen stated that they both gave the exact same version of what occurred, which was essentially the same version that Brittany testified to in court. After talking to both Brittany and her stepfather, Detective Kitchen went to the county prosecutor and obtained an arrest warrant for Henderson.

**{¶13}** Detective Kitchen testified that when he talked to Henderson, Henderson told him that he had worked until about 4:00 p.m. on the day of the shooting and then went to a friend's house on Harvard Avenue. Henderson said that he remained at his friend's house for the rest of the evening.

**{¶14}** The trial court found Henderson guilty of felonious assault against Brittany, with the one- and three-year firearm specifications, domestic violence against Brittany,

and criminal damaging or endangering for the damage to Brittany's girlfriend's car. The court found him not guilty of all other charges.

{¶15} The trial court merged the firearm specifications and felonious assault and domestic violence. The state elected that Henderson be sentenced for felonious assault. The trial court sentenced Henderson to three years for the firearm specification, which was to be served prior to and consecutive to five years for felonious assault. The trial court also sentenced Henderson to six months in prison for criminal damaging or endangering, which it ordered to be served concurrent to the prison term for felonious assault, for an aggregate sentence of eight years in prison. The trial court also imposed court costs and notified Henderson that he would be subject to three years of mandatory postrelease control upon his release from prison. It is from this judgment that Henderson appeals.

## II. Right of Confrontation and Cross-Examination

{¶16} Henderson argues in his first assignment of error that the trial court denied him his due process rights when it prohibited testimony suggesting that there was an alternate shooter. He points to the following exchange between his defense counsel and Detective Kitchen:

[DEFENSE COUNSEL]: Did you ever make any efforts to ascertain the nature of the relationship between the victim and her significant other in terms of whether they were getting along or they were feuding?

[PROSECUTOR]: Objection. Relevance.

THE COURT: Irrelevant. I agree. Let's move on. Let's go to a relevant line, please.

{¶17} Henderson claims that the trial court prevented him from attempting to establish an alternate explanation of the shooter. Although not entirely clear, he appears to be arguing that because Brittany admitted that she has a gun and a license to carry and conceal a weapon, that it was possible that Brittany shot at her girlfriend's car, rather than Henderson, because she and her girlfriend were fighting.

{¶18} The state claims that Henderson is essentially raising an evidentiary issue, and thus, the trial court had full discretion. We disagree. Henderson is arguing that the trial court violated his "right of confrontation and cross-examination," and therefore violated his due process rights. Henderson cites to *State v. Bolton*, 8th Dist. Cuyahoga No. 96385, 2012-Ohio-169, in support of his argument. In *Bolton*, we stated:

> The constitutional right of cross-examination includes the right to impeach a witness's credibility. *State v. Green*, 66 Ohio St.3d 141, 1993 Ohio 26, 609 N.E.2d 1253; *State v. Brewer*, 2d Dist. No. 13866, 1994 Ohio App. LEXIS 3724, 1994 WL 461781 (Aug. 24, 1994); Evid.R. 611(B). Unlike Federal Evid.R. 611, which generally limits cross-examination to matters raised during direct, Ohio Evid.R. 611(B) permits cross-examination on all relevant issues and matters relating to credibility. Weissenberger, Ohio Evidence 2005 Courtroom Manual, at 245-246. Possible bias, prejudice, pecuniary interest in the litigation or motive to misrepresent facts, are matters that may affect credibility. Evid.R. 616(A); *State v. Ferguson*, 5 Ohio St.3d 160, 5 Ohio B. 380, 450 N.E.2d 265 (1983). The denial of full and effective cross-examination of any witness who identifies a defendant as the perpetrator of the offense is the denial of the fundamental constitutional right of confrontation essential to a fair trial. *State v. Hannah*, 54 Ohio St.2d 84, 374 N.E.2d 1359 (1978); *Brewer*, supra.

*Bolton* at ¶ 40. But we went on to point out in *Bolton*:

"On the other hand, trial courts have wide latitude in imposing reasonable limits on the scope of cross-examination based upon concerns about harassment, prejudice, confusion of the issues, the witness's safety, or repetitive, marginally relevant interrogation. *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674. It is within the trial court's broad discretion to determine whether testimony is relevant, and to balance its potential probative value against the danger of unfair prejudice. *In re Fugate* ([Sept. 22,] 2000), Darke App. No. 1512, 2000 Ohio App. LEXIS 4306. We will not interfere with the trial court's decision in those matters absent an abuse of discretion. *Id.* An abuse of discretion * * * implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *Id.*"

*Bolton* at ¶ 41, quoting *State v. Foust*, 2d Dist. Montgomery No. 20470, 2005- Ohio-440.

{¶19} In this case, Brittany testified prior to Detective Kitchen. Defense counsel questioned her extensively on cross-examination about her relationship with Henderson and her relationship with her girlfriend. Defense counsel also questioned Brittany about her 911 call where she told the operator that she had a CCW license and that she "put her weapon away." Defense counsel specifically asked Brittany if she and her "significant other" were having problems. Brittany responded that they were not having any problems.

{¶20} Moreover, the trial court permitted defense counsel to ask Detective Kitchen if he did any investigation to determine if there was another shooter. Detective Kitchen responded, "No. Because there was nothing to suggest that there was another shooter." When further asked why he did not follow up on Henderson's purported alibi, Detective Kitchen replied, "I have two witnesses/victims who identified the same person with the same details laid out as to what transpired, that there was one shooter and it's a family

member and he's identified as Antonio Henderson. I don't see where * * * I've been remiss in overlooking something in trying to dig up a phantom shooter."

**{¶21}** After review, we find that the trial court did not violate Henderson's right to confrontation and right to cross-examine witnesses.

**{¶22}** Henderson's first assignment of error is overruled.

## III. Manifest Weight of the Evidence

**{¶23}** In his second assignment of error, Henderson argues that his felonious assault conviction was against the manifest weight of the evidence.

**{¶24}** Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id*., citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

**{¶25}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id*. In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id*. at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id*., quoting *Martin*.

**{¶26}** Henderson argues that the state's entire case was based on one witness, Brittany, to establish "the critical element of felonious assault: 'attempt to cause physical

harm.'" He maintains that the evidence presented at trial established that he was shooting at Brittany's vehicle and not at her. In support of his argument, he relies on the fact that Brittany's "undisputed testimony" was that "Henderson was not attempting to fire on her but was instead shooting at the car which happened to be in a similar vector." He therefore argues that he should have been convicted of "a lesser charge with negligent or reckless intent" rather than second-degree felonious assault.[2]

{¶27} Henderson cites to *State v. Dunlap*, 8th Dist. Cuyahoga No. 84440, 2004-Ohio-6652, in support of his argument. After reviewing *Dunlap*, however, we find that it supports Henderson's felonious assault conviction. In *Dunlap*, the defendant was convicted of felonious assault. He argued the trial court erred when it did not give a jury instruction on the lesser-included offense of negligent assault.

{¶28} R.C. 2903.14, the negligent assault statute, provides that "[n]o person shall negligently, by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code, cause physical harm to another[.]" Further, under R.C. 2901.22(D),

> A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist.

---

[2]He also argues that he should have been charged with "felony-four vandalism" instead of felonious assault, but that offense would not apply here because the vehicle was not being used for the owner's or possessor's "profession, business, trade, or occupation." *See* R.C. 2909.05.

**{¶29}** In contrast, R.C. 2903.11, the felonious assault statute, provides that "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *; or (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." A firearm constitutes a deadly weapon under R.C. 2923.11(B)(1).

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

R.C. 2901.22(B).

**{¶30}** The facts in *Dunlap* established that after getting into an argument with his neighbor, the defendant went to his garage and retrieved a gun out of his car. He then walked through his backyard, to the corner of his house, and looked toward his neighbor's house. When the victim appeared from inside a U-Haul truck in the driveway, Dunlap "raised his pistol and began to fire." *Id*. at ¶ 9. He shot in the victim's direction three times, hitting him twice.

**{¶31}** In rejecting Dunlap's argument that "he did not intend to shoot Williams," we explained that Dunlap

> pointed a firearm at [the victim] and fired it at least three times. If the appellant did not intend to shoot [the victim], then why did he not fire the pistol in the air, at the ground, or in any direction other than where Williams was standing? The appellant did not accidentally discharge his weapon.

*Id*. at ¶ 39.

**{¶32}** Similarly, in this case, Henderson fired his gun in Brittany's direction at least six times.[3] Brittany's girlfriend's car was between Brittany and Henderson, and while all of the bullets hit the car, Henderson still fired his gun six times in the direction of his sister.

**{¶33}** Henderson maintains that when the detective who processed the car testified, he described the location of the six shots, which were "all below waist level." First, the detective did not testify that all of the shots were below waist level; he just described where the shots were on the car. Second, any one of those bullets could have gone through or over the car and hit Brittany. One of the bullets did go through the side panel and into the trunk of the car. When one knowingly fires a gun in the direction of a person, the elements of felonious assault are met. *See Dunlap*, 8th Dist. Cuyahoga No. 84440, 2004-Ohio-6652, at ¶ 39.

**{¶34}** Accordingly, we find no merit to Henderson's second assignment of error and overrule it.

## IV. Ineffective Assistance of Counsel

**{¶35}** In his third assignment of error, Henderson argues that his trial counsel was ineffective for failing to subpoena other witnesses, including other family members and neighbors, to testify in his defense. He also claims that his trial counsel was ineffective

---

[3]Although there were ten empty shell casings found, no one testified that Henderson fired his gun ten times.

for failing "to argue that [Brittany] testified against [him] because of an ill motive arising out of the paternity" issue.

**{¶36}** To establish that trial counsel was ineffective, a defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel's performance must fall below an objective standard of reasonableness to be deficient in terms of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Moreover, the defendant must show that there exists a reasonable probability that, were it not for counsel's errors, the results of the proceeding would have been different. *State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998).

### A. Calling Other Witnesses

**{¶37}** Henderson claims that there is evidence in the record that "there were defenses which he wanted to raise that were not" raised. Specifically, he points to his statement at the sentencing hearing where he explained to the judge:

> [Brittany] just got up there and just said some things because of a paternity issue. That's what it was really about. If it was really about me shooting a weapon at her, it would be other family members in the courtrom like, yeah, he did it that was supposed to be allegedly there, you know. No one showed up in that defense, and it looked bad in here[.]

**{¶38}** After this exchange, the state went on to tell the trial court that it subpoenaed Brittany and Henderson's mother and stepfather, and they refused to come to court. The state told the court that it had "an in-depth conversation with [the mother]."

The state indicated that the mother "was torn because that is her son as well as * * * her daughter." The state said the mother was "uncooperative throughout this case because it involved her children." The state further explained that it spoke to the stepfather as well and he "did not want to cooperate whatsoever at his wife's request." The state chose not to have them arrested because it felt it had enough evidence to convict Henderson.

{¶39} After Henderson told the court that he felt he was "railroaded" by his sister's testimony, defense counsel stated:

> On the day of trial, the day we were set for the bench trial, he told me he had an alibi. I talked to the prosecution about it. I also called the witness that he said was his alibi witness. What he was telling me and what they were telling me was two different things. Number one, the alibi would have been out of rule but, number two, we also have an obligation not to commit any kind of fraud on the Court or opposing counsel so we didn't go down that path, so I just wanted it to be clear that there is not an issue of anybody being railroaded here. I think Antonio is struggling with the result of the verdict and maybe not choosing some of his words carefully.

{¶40} Although Henderson asserts that there were family members and neighbors who could have testified in his defense, there is nothing in the record to indicate anything other than the fact that defense counsel chose not to call other witnesses due to trial strategy. Decisions about which witnesses to call involve matters committed to counsel's professional judgment. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 127; *see also State v. Jackson*, 4th Dist. Lawrence No. 97CA2, 1997 Ohio App. LEXIS 5433, 2 (Dec. 5, 1997) ("Generally, decisions to call witnesses is within the purview of defense counsel's trial strategy and is not considered deficient performance absent a showing of prejudice."). Stated differently, "counsel's

decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001).

### B. Failing to Argue Brittany's "Ill Motive" Against Him

**{¶41}** Henderson also argues that his trial counsel was ineffective because he failed to raise the argument that his sister was biased against him because of a disagreement they had regarding the paternity of K.B. He claims that "none, or very little of this was argued at trial."

**{¶42}** During cross-examination of Brittany, the following exchange took place between Henderson's trial counsel and Brittany.

Q. Fair to say that you and Antonio really do not get along well?

A. I wouldn't say that.

Q. You would say that?

A. I wouldn't.

Q. You do get along with him?

A. Yes.

Q. At the time that this happened is it fair to say you weren't speaking to him though?

A. Correct.

Q. And you have referenced the child that you believe might be Antonio's?

A. Yes.

Q. Antonio, to your knowledge though, has never taken responsibility for this child, has he?

A. When he first was born, yes.

Q. But subsequent to that he has disputed whether or not this was his child, hasn't he?

A. Yes.

Q. You and Antonio were not speaking that day because of what?

A. He got into an argument with my parents two months prior.

* * *

Q. And isn't it a fact that Antonio argued with your father about the mail?

* * *
A. I don't know what the argument was about.

Q. You don't recall Antonio having problems with his mail?

* * *

Q. When Antonio got into the argument with your parents you didn't like that, did you?

A. Not really.

Q. And that had happened two months prior to Christmas Eve, correct?

A. Yes.

Q. And you still were not on speaking terms with him over the course of those two months, right?

A. Yes.

**{¶43}** After review, we conclude that defense counsel did a thorough job of questioning Brittany about being angry with Henderson for two months prior to the incident and for denying that K.B. was his child.

**{¶44}** He further contends (albeit not very clearly) that he "wanted a full examination of [Brittany] and her girlfriend and their guns." We have reviewed trial counsel's full cross-examination of Brittany regarding what she told the 911 operator about her CCW license, gun, pepper spray, and her girlfriend's purported gun. After review, we conclude that defense counsel questioned Brittany at length about these issues.

**{¶45}** Accordingly, Henderson has not established his trial counsel was deficient for failing to argue Brittany's bias or "ill motive" against him.

**{¶46}** Henderson's third assignment of error is overruled.

**{¶47}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.    The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
EILEEN T. GALLAGHER, J., CONCUR