[Cite as *State v. Boyd*, 2024-Ohio-1059.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | |
| | | No. 112875 |
| v. | : | |
| ALLEN BOYD, JR., | : | |
| Defendant-Appellant. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 21, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-670409-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorney, *for appellee.*

Wegman Hessler Valore and Dean Valore, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant, Allen Boyd, appeals the trial court's judgment convicting him of one count of rape and four counts of gross sexual imposition involving his ex-girlfriend's daughter who was under the age of 10 when the abuse

began and under the age of 13 when the abuse ended. He raises the following assignments of error for our review:

> I. The trial court erred in denying appellant's Rule 29 motions where appellant's convictions for gross sexual imposition in Counts 4, 6, and 7 were not supported by sufficient evidence.
>
> II. The trial court erred to appellant's prejudice and in violation of appellant's constitutional right to confront the witnesses against him by disallowing cross-examination of the alleged victim on the subject of her prior statements concerning sexual activity with appellant.
>
> III. The trial court erred to appellant's prejudice and in violation of appellant's constitutional right to confront witnesses against him by disallowing cross-examination of the alleged victim's father concerning whether he fabricated prior abuse allegations involving the alleged victim in an effort to gain advantage in a custody dispute.

{¶ 2} After review, we find no merit to Boyd's arguments and affirm the trial court's judgment. We conclude that the state presented sufficient evidence to prove beyond a reasonable doubt that Boyd touched the victim's buttocks, vagina, and breasts for the purpose of sexual arousal or gratification, supporting his convictions for gross sexual imposition. We further conclude that the trial court did not err when it denied Boyd's request to cross-examine the victim regarding her alleged prior allegation that she was pregnant with Boyd's child. Finally, we find no error on the part of the trial court in granting the state's request to limit Boyd's cross-examination of the victim's father about a report that he made to child and family services approximately ten years before the trial in this case took place.

## I. Procedural History and Factual Background

{¶ 3}   In May 2022, Boyd was indicted on seven counts that were alleged to have occurred between July 23, 2017, to July 23, 2020, including three counts of rape (Count 1: cunnilingus, Count 2: fellatio, and Count 3: anal intercourse) in violation of R.C. 2907.02(A)(1)(b), first-degree felonies, and four counts of gross sexual imposition (Count 4: buttocks, Count 5: penis, Count 6: vaginal area, and Count 7: breasts) in violation of R.C. 2907.05(A)(4), third-degree felonies.  For each count, the state alleged that the victim was under the age of 13 when the offenses occurred.  Boyd pleaded not guilty to the indictment, and the case proceeded to a jury trial in April 2023.  The following evidence was presented at trial.

### A.  Trial

{¶ 4}   The victim was 14 years old at the time of trial.  In early 2015, the victim's mother started dating Boyd.  Two years later, when the victim was approximately eight-and-a-half years old, she and her mother began living with Boyd in a home on Cedar Avenue.  In May 2017, the victim's half-sister was born; Boyd was the baby's father.

{¶ 5}   The victim testified that around the time they moved to Cedar Avenue and her half-sister was a baby, Boyd began touching her.  The victim's mother was not home or was not around when it happened.  The victim stated that Boyd touched her in her bedroom and the living room.  The victim testified that Boyd touched her "chest," which she agreed meant her breasts, her "private part," which she agreed meant her vagina, and her "butt."  Boyd touched her breasts, vagina, and buttocks

both over and under her clothes. When it happened in her bedroom, the victim said that she awoke to Boyd touching her and she pretended to be asleep. She tried to tell him no, but "[h]e would just keep on trying."

{¶ 6} The victim further testified that Boyd forced her to touch his penis. The victim explained that he would "grab [her] hand" and put it on his penis. He also showed her how to touch it. She demonstrated to the jury how she touched Boyd's penis. The victim said Boyd's penis was soft at first but then it became hard. She also felt something come out of his penis.

{¶ 7} The victim testified that Boyd would also "make [her] put [her] mouth on his penis." The victim said that it happened "a lot," explaining that "a lot" meant "almost every other day." Although she could not remember exactly when it happened, she thought that it happened "closer to when he moved out," which was in February 2019. She explained that Boyd "would grab [her] head" and "put [her] mouth to his penis." The victim testified that Boyd's penis was hard and "white" stuff would come out.

{¶ 8} The victim also testified, "I think [Boyd] put his penis in my butt a little bit and then he stopped." She said that it happened when she was eight or nine years old. They were in the living room at the time, and she was standing, bent over the couch. Boyd was standing behind her. His penis was hard. She said that it hurt when he did it, so she told him to stop and he did.

{¶ 9} The victim testified that her mother saw Boyd sitting on the victim's bed one night. According to the victim, Boyd was touching the victim's buttocks

under her clothes when her mom walked by her bedroom. The victim's mother yelled at Boyd and "told him to get out." Boyd left the home that night but came back the next day. The victim said that she was mad that her mother allowed Boyd to come back, but she understood that her mother "was probably scared * * * because [Boyd] was always hitting on her and abusing her."

{¶ 10} The victim testified that Boyd told her "all the time" not to tell her mother. The victim stated that the abuse continued to occur until Boyd moved out. But she said that Boyd touched her buttocks a few times when he came to pick up her half-sister after she and her mother had moved to a home on Kildare Road in August 2020.

{¶ 11} The victim's mother also testified that she saw Boyd lying in bed with the victim at night in July 2018. The victim's mother said to Boyd, "What the f*ck you doing in here?" The victim's mother and Boyd got into a physical altercation that night. The victim's mother stated that Boyd pushed her so hard that she tore a ligament in her knee. The victim's mother testified that she did not ask the victim about Boyd at that time because the victim's mother "was going through stuff" and did not "have the right state of mind." The victim's mother also said that she was terrified of Boyd because he physically abused her. The victim's mother never saw any other incidents where Boyd was inappropriate with the victim, but she always had a "weird vibe" about it.

{¶ 12} The mother's cousin ("the cousin") and her son lived with the victim and her mother at the home on Kildare Road. The cousin suspected that something

was wrong with the victim because the victim seemed "unhappy and uncomfortable." The cousin "knew something wasn't right" with the victim. The cousin initiated a conversation with the victim in November or December 2021. According to the cousin, the victim disclosed to her that Boyd had sexually abused her, including "vaginal sex" but not "anal sex." The cousin told the victim's mother.

{¶ 13} The victim, however, denied on cross-examination that she told the cousin that Boyd had vaginal sex with her. The victim stated that she told the cousin only that Boyd "was touching" her.

{¶ 14} The victim's mother testified that after the cousin told her what the victim had disclosed to her, the victim's mother took the victim out of school. The victim's mother stopped allowing Boyd to come to the Kildare home to pick up their daughter. The victim's mother also testified that she asked the victim if she wanted to go to the police, but the victim did not want to at that time.

{¶ 15} In February 2022, the victim messaged her friend through Instagram and told her that she was going to run away. The victim asked her friend if she could stay with her. Her friend responded, "why? what's wrong[?]" The victim replied, "YK I got rapped nd stuff." In the next message, the victim stated, "yk all ready." The victim testified that "yk" meant "you know." The victim explained that she had previously told her friend that she had been raped because her friend had been raped too. The victim then sent a series of messages without a response from her friend: "so i think I told u this[,] but she let him in after she seen his touching me," "yk I dont celebrate holidays," and "she said if i don't wanna be in the truth i can get out

of her house." The victim explained that she wanted to run away because she was afraid that her mother would let Boyd back in their home, but also because she did not want to be an Israelite, which was her mother's religion. The victim wrote her mother a note to tell her that she was running away from home.

{¶ 16} The victim's mother called the victim's father when she found the victim's note. The victim's father went to the Kildare home and looked through the victim's computer. He saw the victim's Instagram messages to her friend. He messaged the victim through Instagram, and the victim told him where she was. He picked the victim up from her friend's house and took her to the police station. After they left the police station, the victim went to live with her father, where she still lived at the time of trial.

{¶ 17} Detective William Robinson testified that he became involved with this case in February 2022, when he received reports that the victim had been found. He reviewed the victim's Instagram messages that the victim sent to her friend. He discussed each of them with the victim.

{¶ 18} Detective Robinson also interviewed the victim's father, mother, and the cousin. Detective Robinson reported the victim's allegations to the Cuyahoga County Division of Children and Family Services. Detective Robinson agreed that the victim never told him that she ran away because she was afraid of Boyd coming back to live with them.

{¶ 19} The victim's mother agreed that she told the detective that she thought her daughter was lying about Boyd touching her at the Kildare home

because the victim was never alone with Boyd at that house. The victim's mother denied that she and the victim got into an argument about religion. The victim's mother also agreed that when the detective first called her, she denied knowing that the victim had said Boyd was sexually abusing her. The victim's mother stated that the detective "caught [her] off guard." But the victim's mother went to the police station the following day and gave a statement telling him everything that she knew.

{¶ 20} The cousin agreed that she told the detective that the victim had a smirk on her face when she said that "Boyd stuck his penis in her vagina." But the cousin explained that the victim "smiles when she is uncomfortable." The cousin also told the detective that the victim ran away to a house with 11 or 13 boys and that she ran away because she was getting into trouble at her mother's home. The cousin told the detective that the victim was saying bad things about her mother because she wanted to live with her father because he did not have rules and her mother did.

{¶ 21} A child protection specialist from Cuyahoga County Division of Children and Family Services testified that she interviewed the victim after she went to the police station. The child protection specialist stated:

> [The victim] disclosed to me her mother's ex-boyfriend, Allen Boyd, he had been — it started off with her — with him inappropriately touching her on her breast, on her vagina, and on her butt over her clothing and underneath her clothing. And then she stated that he forced her to touch his penis with her hand, and also put her mouth on his penis, and then she disclosed there was one time where he attempted to put his penis in her butt and it did not — she said that it didn't go in all the way, and that she asked him to stop, and he did.

**B. Post-Trial Motions**

{¶ 22} At the close of the state's case, the state moved to dismiss Count 1, rape, regarding cunnilingus. The state also moved to amend the date range on the indictment, which originally was July 23, 2017, to July 23, 2020. The state requested to amend it to March 1, 2017, to February 3, 2019. The state argued that the evidence at trial established the new date range, which was essentially the time when Boyd, the victim, and her mother moved into the Cedar Avenue home until the time when Boyd moved out of the home. The trial court granted the state's motions over Boyd's objections.

{¶ 23} Boyd moved for acquittal under Crim.R. 29(A) on Counts 2 through 7, which the trial court denied.

**C.  Jury Verdict and Sentence**

{¶ 24} The jury found Boyd not guilty of Count 3, but guilty of Counts 2 and 4 through 7. The trial court sentenced Boyd to life in prison with parole eligibility after ten years on Count 2, and five years for each of Counts 4 through 7. The trial court then ordered Counts 4 and 7 to run concurrent to Counts 2, 5, and 6, and ordered Counts 5 and 6 to run consecutive to each other and to Count 2, for an aggregate sentence of "parole eligibility after serving 20 full years of imprisonment." The trial court also ordered Boyd to serve five years of postrelease control upon his release from prison and classified him as a Tier III sex offender. It is from this judgment that Boyd now appeals.

## II. Sufficiency of the Evidence

{¶ 25} In his first assignment of error, Boyd argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal. Specifically, he argues that three of his gross sexual imposition convictions, Counts 4 (buttocks), 6 (vagina), and 7 (breasts) were not supported by sufficient evidence because the state did not establish that he touched these areas on the victim for the purpose of sexual gratification or arousal. He concedes that for Count 5, which alleged that he caused the victim to touch his penis, the state presented sufficient evidence of gratification or arousal because the victim testified that his penis was soft when she first started touching it, but then it would become erect, and that Boyd sometimes ejaculated. He contends that unlike Count 5, there was no evidence that he touched the victim's breasts, vagina, or buttocks for the purpose of sexual gratification.

{¶ 26} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. When considering a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to

assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 27} Boyd was convicted of gross sexual imposition under R.C. 2907.05(A)(4), which provides in relevant part:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 28} "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). It is the latter half of this definition — "for the purpose of sexually arousing or gratifying"— that Boyd claims the state did not prove beyond a reasonable doubt.

{¶ 29} While the Ohio Revised Code does not define sexual arousal or sexual gratification, R.C. 2907.01(B) "'contemplate[s] any touching of the described areas which a reasonable person would perceive as sexually stimulating or gratifying.'" *State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, ¶ 18, quoting *State v. Astley*, 36 Ohio App.3d 247, 250, 523 N.E.2d 322 (10th Dist.1987). In proving gross sexual imposition, "'there is no requirement that there be direct testimony regarding

sexual arousal or gratification.'" *Id.* at ¶ 19, quoting *State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-2664. Indeed, this court has recognized that

> [i]n determining whether sexual contact occurred, the trier of fact may infer from the evidence presented at trial whether the defendant's contact with the areas of the body outlined in R.C. 2907.01 was for the purpose of sexual arousal or gratification. *Tate* [at ¶ 19]; *State v. Cobb*, 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991). The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Tate* at ¶ 20, citing *Meredith*; *see also Ohio v. Coleman*, 8th Dist. Cuyahoga No. 102291, 2015-Ohio-4491, ¶ 7 (finding that purpose may also be inferred from the defendant's conduct as well as his or her personality). Accordingly, "[i]f the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Cobb* at 185.

*State v. Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, ¶ 65.

{¶ 30} Viewing the evidence in this case in a light most favorable to the prosecution, we conclude that the state presented sufficient evidence such that a rational trier of fact could find that Boyd touched the victim's buttocks, vagina, and breasts for the purpose of sexual arousal or gratification. According to the victim's testimony, Boyd touched her buttocks, vagina, and breasts in her bedroom and in the living room of their home for nearly a two-year period. The victim stated that the touching began around the time they moved into the Cedar Avenue home in March 2017, when she was only eight-and-a-half years old, and continued until Boyd moved out in February 2019, when she was ten-and-a-half years old. The victim further testified that Boyd would touch her when her mother was either at work or

at the store. When Boyd came into her bedroom at night, the victim would awake to Boyd touching her. She also said that Boyd would touch her buttocks, vagina, and breasts over and under her clothing. We conclude from this evidence that the jury could rationally infer that Boyd touched the victim's buttocks, vagina, and breasts, which are all expressly listed as "erogenous zones" under R.C. 2907.01(B), for his sexual arousal or gratification.

{¶ 31} Accordingly, we conclude that the state presented sufficient evidence for the trier of fact to find Boyd guilty of gross sexual imposition under R.C. 2907.05(A)(4) beyond a reasonable doubt.

{¶ 32} We therefore overrule Boyd's first assignment of error.

## III. Rape Shield Law, Confrontation Clause, and Cross-Examination of the Victim

{¶ 33} In his second assignment of error, Boyd contends that the trial court violated his constitutional right to confrontation when it did not permit him to cross-examine the victim or the detective about "whether [the victim] had been joking around about having [Boyd's] child." He asserts that Ohio's rape shield law "bars inquiry into sexual activity, not a person's lies about their sexual activity." Boyd maintains that cross-examination is "particularly important * * * when the witness has made inconsistent statements concerning sexual activity, and where such statements may have been made in jest." Finally, Boyd claims that the trial court should have held an in camera hearing pursuant to *State v. Boggs*, 63 Ohio St.3d

418, 588 N.E.2d 813 (1992), to determine whether the victim's "prior allegation was unfounded and therefore fair game for cross-examination."

{¶ 34} "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the [s]tate's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed2d 297 (1973). The rights to confront witnesses and to defend, however, are not absolute and may bow to accommodate other legitimate interests in the criminal process. *Id*. at 295.

{¶ 35} Ohio's rape shield law is set forth in R.C. 2907.02(D). It states in relevant part that

> [e]vidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

{¶ 36} Several legitimate state interests are advanced by the rape shield statute: (1) protect the victim's privacy, (2) discourage putting the victim on trial, and (3) encourage rape victims to report crimes. *State v. Gardner*, 59 Ohio St.2d 14, 17-18, 391 N.E.2d 337 (1979). Although evidence of a victim's "sexual activity" is prohibited under the rape shield statute, *State v. Jeffries*, 160 Ohio St.3d 300, 2020-Ohio-1539, 156 N.E.3d 859, ¶ 14, "[f]alse accusations, where no sexual activity is

involved, do not fall within the rape shield statute." *Boggs*, 63 Ohio St.3d at 421, 588 N.E.2d 813.

{¶ 37} In determining whether the rape shield law would unconstitutionally infringe on a defendant's rights, a court must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *Gardner* at 17.

{¶ 38} In *Boggs*, the Ohio Supreme Court explained that because false accusations do not fall within the rape shield statute, "a defendant is permitted under Evid.R. 608(B), in the court's discretion, to cross-examine the victim regarding such accusations if 'clearly probative of truthfulness or untruthfulness.'" *Id*. at 421. Evid. R. 608(B) provides in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, * * * may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness[.]

{¶ 39} "Evid.R. 608(B) provides a well-established rule of law that protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *Boggs*, 63 Ohio St.3d at 422-23, 588 N.E.2d 813.

{¶ 40} The Ohio Supreme Court held in *Boggs* that when "an alleged rape victim admits on cross-examination that she has made a prior false rape accusation, the trial judge shall conduct an in camera hearing to ascertain whether sexual

activity was involved" and, if so, "cross-examination on the accusation would be prohibited by R.C. 2907.02(D)[.]"  *Id.* at paragraph two of the syllabus.  However, "[i]f the trial court determines that the accusations were entirely false, the trial court has discretion to determine whether to permit defense counsel to proceed with cross-examination of the alleged victim pursuant to Evid.R. 608(B)."  *Id.* at 421. "Finally, a trial judge must always bear in mind his or her responsibility to weigh the probative value of any relevant evidence against the danger of unfair prejudice."  *Id.* at 423-424, citing Evid.R. 403(A).

{¶ 41} "When the defense seeks to cross-examine on prior false accusations of rape the burden is upon the defense to demonstrate that the accusations were totally false and unfounded.  Hence the initial inquiry must be whether the accusations were actually made by the [the victim]."  *Id.* at 423.

{¶ 42} In this case, Boyd did not meet the threshold requirement of establishing that the victim actually made the allegation.  When cross-examining the victim, defense counsel asked her, "So [Detective Robinson] went through your Instagram records, * * * and he asked you whether or not you had ever joked about being pregnant with [Boyd's] child?"  The state objected.  The trial court had a discussion with counsel at sidebar.  That discussion is not in the record on appeal. The court sustained the objection.

{¶ 43} During cross-examination of Detective Robinson, defense counsel asked him if he learned during his investigation that the victim had made allegations against Boyd when she was younger.  Although not entirely clear, it appears as if

defense counsel was asking the detective about prior allegations of rape made by the victim that are not part of the indicted charges in this case. The detective denied that he knew of any other allegations made by the victim other than the ones she made in the current case. When defense counsel attempted to ask Detective Robinson another question, the state objected. The court and counsel had a discussion at sidebar. That discussion is not in the record. The court sustained the objection.

{¶ 44} After the detective was done testifying, defense counsel informed the court that he would like to place an objection on the record. Defense counsel stated that he "requested on two separate occasions to see if the court would permit [him] to get into part of the interview where the detective asked the alleged victim whether or not she was joking around about having Mr. Boyd's child." Defense counsel explained that he believed it was "germane because if the young lady is joking around like that, I want to know whether or not she has told anyone that she had vaginal sex with my client, and I think that testimony has to come out." Defense counsel stated that the cousin testified that the victim told her that Boyd had vaginal sex with her. Defense counsel argued that because the victim's testimony now is that Boyd had anal sex with her, he had "a right to delve into that issue."

{¶ 45} Boyd's counsel further argued:

Look. This is — these are some heavyweight allegations. I want to know the answer to whether or not this is something she's represented, whether or not it's something she thought was true or if she was just joking around. The detective didn't follow-up on this line of questioning like I would like to think I would have or he would have

on a different day, and I think it may be truth-bearing at the end of the day for these jurors in terms of what actually happened and what she said. I wanted to impeach her based on that information. This court has said no in terms of cross-examining her on it and the court has said no as it relates to cross-examining the detective on it. So I just want you to note my objection for the record, and I thank you for allowing me to be heard.

{¶ 46} The court asked defense counsel, "What do you mean by the detective had reports or information that she joked about being pregnant?" Defense counsel responded, "If I said that, that's not what I intended to say. I think what I said is that the detective — when you look at the interview, you're under the impression Detective Robinson is going through Instagram records or has gone through Instagram records and maybe he's referencing a point in his Instagram records where she may have joked about being pregnant with Mr. Boyd's child." The court asked defense counsel if he had access to the victim's Instagram messages. Defense counsel responded that he had access to "[a]ll 10,000, 20,000 pages" of Instagram records. The court then asked defense counsel, "Is there anything in there that says such a thing?" Defense counsel responded, "We didn't see that, but it doesn't preclude me from being able to inquire about it since it was raised. I don't think I have to see it myself in the record in order for me to cross-examine the detective or the alleged victim on that issue."

{¶ 47} When trying to explain how he would try to impeach the victim, defense counsel stated, "I think I was alluding to trying to ask her about whether or not that's something that she ever said, whether or not she had messaged about that. That would have been my follow-up with respect to that." The state told the court:

There's no indication any of the Instagram records received by the state turned over to [defense counsel] that [the victim] had ever joked about being pregnant with the defendant's child. Had that been in the records, perhaps maybe [defense counsel] would have had a little bit more leeway to ask her about that. However, asking her, "Why did the detective ask you this" is improper. It's speculative. Asking him, "Why did you ask her this" is essentially trying to impeach her because — and she never testified that there was vaginal sex. She only testified and conveyed to the detective, to the social worker of anal sex. It's not relevant. It's overly prejudicial even if it's not protected by the rape shield and there's no indication of it in the Instagram records whatsoever.

{¶ 48} The court stated, "I made the ruling that the alleged victim could not answer a question about what the detective told to her outside of the courtroom, and there was no relevancy or evidence of pregnancy involving this defendant in any way. So, therefore, it was not properly admitted. That was my ruling."

{¶ 49} After review, we find no Confrontation Clause, statutory, or evidentiary violation. Defense counsel argued to the trial court that it appeared that something might be in the victim's Instagram records that led the detective to ask her, when interviewing her, whether she had ever lied about being pregnant with Boyd's child.[1] However, defense counsel conceded when asked by the trial court that the state had provided the victim's Instagram records to him before trial. And when further asked by the trial court if the victim had ever made such an allegation, defense counsel could not point to anywhere in the Instagram records where she

_____

[1] The detective's interview of the victim is not in the record on appeal.

had done so or to any other evidence in the record indicating that the victim had made such a statement. Boyd's claims are therefore speculative.

{¶ 50} We note that under Evid.R. 607(A), a party is permitted to attack the credibility of a witness for impeachment purposes. But the questioner must have a "reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." Evid.R. 607(B). Boyd did not establish a reasonable basis in this case.

{¶ 51} When there is no evidence that the victim made prior false allegations of rape, or as in this case, no prior allegation at all, *Boggs,* 63 Ohio St.3d at 422-23, 588 N.E.2d 813, does not require the trial court to permit cross-examination or in camera questioning of the victim to search for that evidence. In *State v. McKinney*, 10th Dist. Franklin No. 13AP-211, 2013-Ohio-5394, the appellant argued that *Boggs* required the trial court to hold an in camera hearing "to determine whether an alleged rape victim may be cross-examined on prior false accusations of rape." *Id*. at ¶ 29. The Tenth District disagreed, explaining that "[d]efense counsel presented the court with no evidence that S.K. made accusations of rape or other sexual activity against someone other than appellant, let alone false ones." *Id*. at ¶ 32. The court further stated, "In essence, appellant complains the court did not permit him to search for evidence of false accusations of rape through in camera questioning of S.K. and her parents." *Id*. at ¶ 33. The court concluded, "We do not read *Boggs* to mandate trial courts to permit in camera questioning of the victim and other state's

witnesses regarding alleged false accusations of sexual activity in the complete absence of evidence the victim even made an accusation." *Id.* at ¶ 37.

{¶ 52} We conclude that Boyd did not meet the threshold requirement of establishing that the victim made any allegations of a prior rape. *Boggs* at 423. Therefore, the trial court did not err when it prohibited Boyd from cross-examining the victim or the detective regarding the supposed prior allegation when there was no evidence the victim made such an allegation.

{¶ 53} To the extent that Boyd also argues within this assigned error that the trial court erred when it did not permit him to cross-examine the victim about prior statements that she made to the cousin about Boyd having vaginal sex with her, we disagree. Defense counsel cross-examined the cousin and the victim regarding statements that the victim allegedly made about vaginal sex.

{¶ 54} Boyd's second assignment of error is overruled.

## IV. Confrontation Clause and Cross-Examination of the Victim's Father

{¶ 55} In his third assignment of error, Boyd argues that the trial court erred when it did not permit him to cross-examine the victim's father regarding a prior custody case where the father sought custody of the victim when she was four-years old. According to Boyd, the victim's father reported to children and family services at the time of the prior custody case that a 17-year-old relative of the victim's mother was sexually abusing the victim. Boyd claims that the victim's father reported this to gain an advantage in the custody case. Boyd maintains that the victim's father's credibility was "a central issue" in the present case because the victim's father is the

one who brought the current allegations to the police and, therefore, his motives for doing so are suspect.

{¶ 56} Generally, the trial court has broad discretion in imposing limits on the scope of cross-examination. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). Although "'trial courts have wide latitude in imposing reasonable limits on the scope of cross-examination,' courts should impose such limits 'based upon concerns about harassment, prejudice, confusion of the issues, the witness's safety, or repetitive, marginally relevant interrogation.'" *State v. Henderson*, 8th Dist. Cuyahoga No. 106627, 2018-Ohio-3797, ¶ 18, quoting *State v. Bolton*, 8th Dist. Cuyahoga No. 96385, 2012-Ohio-169.

{¶ 57} When cross-examining the victim's mother, defense counsel asked her if the victim made "these kinds of allegations" when she was four-years old. The state objected, and the trial court sustained the objections. Before questioning the victim's father on direct examination, the state moved in limine to prevent defense counsel from getting into prior allegations that the victim's father made against the mother's 17-year-old relative. The trial court granted the state's motion. It ruled that Boyd could question the father about the prior custody case but not get into the allegation involving the mother's 17-year-old relative.

{¶ 58} After review, we conclude that the trial court did not abuse its discretion when it limited Boyd's cross-examination of the victim's father regarding prior allegations that he made with respect to mother's 17-year-old relative. We agree that the evidence is not relevant here. There had not been a custody case

pending in nearly ten years, and there was no testimony that the victim's parents did not agree on their current custody arrangement.

{¶ 59} Moreover, the victim told the cousin about Boyd sexually abusing her. The victim's mother also suspected that Boyd was sexually abusing her daughter after she saw Boyd lying in bed with the victim one night, causing a confrontation between the victim's mother and Boyd. The victim's mother then learned of the sexual abuse after the victim disclosed it to the cousin. And after the victim ran away, the victim's mother and father looked through the victim's Instagram messages and saw that the victim told her friend about Boyd raping her. Even if the victim's father reported possible abuse to children and family services when the victim was four, it has no relevance to the current case.

{¶ 60} Accordingly, we overrule Boyd's third assignment of error.

{¶ 61} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
LISA B. FORBES, J., CONCUR